**Amy Lynn POWERS**

v.

**AMERICAN EXPRESS FINANCIAL ADVISORS, INC.**

v.

**Michael D'Ambrosia.**

**No. CIV. S 99–385.**

United States District Court, D. Maryland.

Jan. 24, 2000.

Clifford R. Bridgford, Law Office, Frederick, MD, for Amy Lynn Powers, plaintiffs.

Gilbert W. Boyce, Law Office, Washington, DC, for American Express Financial Advisors Inc., defendants.

## MEMORANDUM OPINION

SMALKIN, District Judge.

This is a diversity case removed from a Maryland state court, in which Amy Lynn Powers seeks to hold the defendant, American Express Financial Advisors, Inc. (American Express), liable under a number of theories for an alleged wrongful transfer of financial assets that she held in a joint-and-survivor account with her former boyfriend, Michael D'Ambrosia, whom American Express has sued as a third party defendant.

The case is before the Court on cross motions for summary judgment, which have been fully briefed. No oral argument is needed. Local Rule 105.6, D. Md.

The relevant, undisputed facts establish that Powers and D'Ambrosia started a romantic union in 1983 and jointly purchased a house in Emmitsburg, Maryland, in 1990. At that time, D'Ambrosia was an accountant for a corporation called Signal Perfection, Ltd. (Signal). Powers and D'Ambrosia had a number of joint bank accounts, and, in mid-July, 1994, they entered into a mutual fund investment relationship with American Express. Their holdings were in joint-and-survivor form, pursuant to the Investment Application they filled out when making their first investment. It is undisputed that all of the deposits were made by D'Ambrosia and none of the income or losses was reported by Powers. Apparently, this account was intended to provide some sort of reimbursement to Powers for her domestic services and was also intended, should both she and D'Ambrosia die, ultimately to go to her mother.

The ship of domestic bliss on which Powers and D'Ambrosia had been sailing struck a reef in the summer of 1997, one result of which was that American Express was given an oral request by D'Ambrosia himself to "freeze" the investments, apparently to assure Powers that the assets would remain untouched until they could agree on their disposition. On October 16, 1997, D'Ambrosia sent American Express

a communication requesting redemption of the investments and wire transfer of the proceeds to a joint bank account he had with Powers in Frederick. Attached to the faxed communication—which appeared on the letterhead of Signal, and was signed "Michael"—was a letter addressed to American Express, dated September 26, 1997, and bearing what purported to be the signatures of D'Ambrosia and Powers and the notary seal and signature of one Otis K. Comstock, a notary public in and for Carroll County, Maryland, releasing the freeze and directing transfer of the proceeds to Prudential (another financial services agency). A copy of the faxed communication is attached to this opinion as an appendix.

It is undisputed that Mr. Jeffrey Helms of American Express compared the signature on the September 26 letter with an exemplar of Amy Powers' signature, and verified the signature as hers. At her deposition, Powers acknowledged the fact that the signature on this instrument "resembled" her signature, but, indeed, the fly in the ointment—and what engendered this lawsuit—is that D'Ambrosia had forged Powers' signature to that document.

As one might expect, D'Ambrosia cleaned out the joint bank account after the transfer and fled with the funds, thus leaving Powers both stranded and penurious. She has now turned to American Express to seek satisfaction, at least for the financial part of her loss.

One more little fact is needed to round out the picture. Defendant raises a strong suspicion that much—if not all—of the funds in the account was money embezzled by D'Ambrosia from Signal. D'Ambrosia entered into a civil settlement with Signal, and, apparently as a result, is not now in jail, although he is said to be "on the run." (He is a third-party defendant in this lawsuit.) There is a dispute as to the extent of Powers' knowledge of her former boyfriend's malefactions, but it is not material to the disposition of the pending motions, for reasons that will appear *post*.

Summary judgment is awarded under Fed.R.Civ.P. 56 when there is no genuine dispute of material fact and when the movant demonstrates by a properly supported motion (as here) its plain entitlement to judgment as a matter of law. There is no genuine dispute of material fact unless the opponent brings forth facts upon which a reasonable fact-finder could find in his favor by the appropriate proof burden, were the case at the directed verdict stage. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

On the present record, the defendant is not entitled to summary judgment, but the plaintiff is.

There is agreement that this case involves "financial assets," as defined in MARYLAND COMMERCIAL LAW CODE ANN. ("U.C.C.") § 8–102(a)(9). As such, this transaction is governed by Title 8 of the Maryland U.C.C., as recently revised, which sets up a comprehensive mechanism for dealing with rights and obligations of those who own (called "entitlement holders") and those who hold financial assets for them (called "intermediaries"). Entitlement holders are entitled to give orders to their intermediaries on the transfer, disposition, etc., of financial assets. Unfortunately, there is no discernible case law anywhere under revised Article 8 of the U.C.C. (Title 8 in Maryland)—and very little commentary—dealing with the question of the effect of an entitlement order that is authorized by only one of the entitlement holders on a joint account. What commentary there is, as will be seen, has been taken into account by the Court.

It is clear that both D'Ambrosia and Powers were entitlement holders, as defined in Section 8–102(a)(7), in that they were identified in the records of the securities intermediary (defendant) as having a security entitlement against the intermediary. As such, D'Ambrosia was an "appropriate person" to give an entitlement order to the defendant. *See* U.C.C.

§ 8–107(a)(3). When the appropriate person gives an entitlement order, the securities intermediary has a duty to comply with the order, a duty which is satisfied if the intermediary exercises due care in accordance with reasonable commercial standards to comply with the entitlement order. U.C.C., § 8–507(a)(2). That duty requires that the intermediary will first have had a reasonable opportunity to assure itself that the entitlement order is genuine and authorized.

The problem for the defendant here is that, according to the terms of Section C of its Investment Application, under which the account was established, it is clear that *signatures* of *both* D'Ambrosia and Powers were required for any redemption request for over $50,000. Thus, for any redemption over $50,000 (and this one was for over $86,000), the defendant itself required both holders' authorizations.

Powers claims, as an entitlement holder, that American Express failed in its duty to her under Section 8–507 (which is the section that is intended to govern the liability of the securities intermediary to its entitlement holder *as such* ) by following an instruction made without her authority. The Court is of the opinion, as a matter of law, that, even if American Express exercised due care in accordance with reasonable commercial standards by verifying the signature against a known Amy Powers' exemplar and by noting the presence of a notary's signature and seal on the document (but note that the document bearing the signature authorized transfer to Prudential, not to a bank), it is still liable to Powers, because the order, for which she never gave any form of authorization or ratified, was "ineffective."

■ As is made clear by the Official Comments to Section 8–507, an intermediary such as defendant incurs liability to an entitlement holder if it honors an order that is "ineffective." Section 8–107(b) establishes when an order is effective. Although that provision is somewhat tautological (by its reference to effective orders as those made by the "appropriate person," notwithstanding the discussion in Official Comment 4 to Section 8–507 of the purported difference between orders made by an appropriate person and ineffective orders), both the reference in Section 8–107 to principles of agency and Official Comment 4 to Section 8–507 lead to no other conclusion than that, when the intermediary has agreed that the "appropriate person" to make an order is both owners of a joint account, both owners must make the order (unless, of course, agency and ratification principles might render the order "effective" under Section 8–107(b)(2) and/or (3), which is not the case here). No facts whatever are advanced that would show that D'Ambrosia had any sort of authority to affix Powers' forged signature to the document accompanying the order or that she ever ratified it.

As noted above, the commentary found by the Court supports this conclusion. For example, it is noted in Hawkland's *Uniform Commercial Code Series,* Section 8–107:03:

Thus, to say that . . . a direction is not effective is to say that . . . the [intermediary] is liable to the true owner . . . if it turns out that the . . . entitlement order was not actually authorized. Note too that . . . liability . . . does not depend on awareness of the lack of authority. The record keepers must, at peril of absolute liability, take steps to assure themselves that the transfer is authorized.

In this case, it may be argued that the imposition of liability on defendant is unfair. There are two answers to that argument. The first is that, whenever two relatively innocent persons are bamboozled by the same evil-doer, the loss must rest somewhere. In such cases, the loss usually rests with he who is in the better position to protect himself and does not do so. Looking at the analogous situation under the (perhaps more familiar) law of commercial paper, and particularly the warranties on presentment, in the case of a forged drawer's signature on a check, the loss rests with the paying drawee, who is in a position to verify the drawer's signa-

ture. *See Price v. Neal,* 3 Burr. 1354 (1762). That loss rests with the drawee no matter how artful the forgery, unless the drawer is precluded from asserting the forgery (as he may be by, *inter alia,* agency law, just as an entitlement holder may be under Section 8–107(b)(3)). Similarly, the ultimate loss from a forged title endorsement rests with the first taker of the check post-forgery, no matter how artful the forgery. In short, the drawee and the taker, respectively, are in better positions to protect themselves from the loss occasioned by the forgery than is the person whose signature has been forged while she was unaware she was being victimized, even though they exercised due care and followed reasonable commercial standards.

Under the facts of this particular case, it is evident that the defendant could have protected itself better against the loss in question, as it acted only on the basis of Powers' signature on a faxed transfer request; the instrument purportedly signed by Powers was not only almost three weeks older than the transfer order, but dealt with a transfer to a different entity (Prudential Securities) than did the faxed request (to a bank account in Frederick). Furthermore, the defendant did not request the original document to check it for any obvious alteration, nor did it require an acknowledged signature (which would, if the notary properly performed his duty, have required him to state that Powers had personally appeared before him). Hence, there is no unfairness in bringing the loss to rest with defendant.

■ It should also be noted that, as to joint accounts, it is the intermediary's own contract that has defined what constitutes an effective order. The Court's conclusion is, thus, entirely consonant with Official Comment 4 (second paragraph) to Section 8–507, which leaves to "other law" questions "such as allocation between the securities intermediary and the entitlement holder of the risk of fraudulent entitlement orders." Here, such risk, as to transfers over $50,000, has been assumed by the defendant, by a contract, which,

although not specifically dealt with in Title 8 is not inconsistent therewith. *See* U.C.C. Section 1–103. The remedy to which Powers is entitled is a recredit of the account. *See* Hawkland, *supra,* Section 8–109:01. Of course, defendant is entitled to recover its loss against D'Ambrosia under Section 8–109. *Id.* Because it is clear that, in Maryland, a joint tenant is entitled to the entirety of the property held jointly, regardless of which tenant generated the property, *see* 13 *Maryland Law Encyclopedia,* Joint Tenancy, Section 2 (1999) at 277, the Court will order the entire account restored in favor of Powers.

■ One cannot view Powers as an "adverse claimant" under Section 8–115, as she is simply one of two entitlement holders, and not one of the individuals Section 8–115 was intended to protect. To the extent that the Court's opinion denying defendant's Rule 12(b)(6) motion can be read to the contrary, it is not accurate.

■ The Court has considered the other arguments advanced by the defendant and the plaintiff, and it finds them unpersuasive and inconsequential to the result it has reached on the merits. Addressing the constructive trust argument in particular, defendant does not have standing to assert a constructive trust on behalf of Signal. *See, e.g., Aliano, Aliano & Aliano v. Aliano,* 251 A.D.2d 436, 674 N.Y.S.2d 404 (1998)(constructive trust plaintiff must have standing as the one defrauded). *See also, Miller v. Mauzey,* 960 S.W.2d 564, 569 (Mo.App.1998)(same). Even if American Express had standing to impose a constructive trust, the settlement agreement and release would preclude Signal (and, hence, defendant derivatively) from impressing the funds with a constructive trust. Furthermore, there is no reasonable possibility that defendant could trace the "bad" funds in question adequately to impose a constructive trust upon them under Maryland law. *See Brown v. Coleman,* 318 Md. 56, 566 A.2d 1091 (1989).

■ To the extent that plaintiff seeks summary judgment for defendant's alleged

non-compliance with the transfer order that she alleges she never signed, the Court agrees with defendant that plaintiff is certainly not entitled to prevail on **that** claim, for obvious reasons, including judicial estoppel. To allow her simultaneously to allege that the order was invalid and valid, as she has done in the litigative mess following the wake of D'Ambrosia's having bolted, would be a condonation by the Court of inequitable conduct, to the obvious prejudice of the defendant.

▮▮ Defendant raises a few other arguments that need only cursory discussion. First, it claims that there was not a two-signature requirement, because the funds were transferred from a number of accounts, none of which amounted to $50,000 or more by itself. The difficulty with this argument is that, based on its own application and records, the defendant treated the multiple mutual fund holdings as one "group account," and the application form mentioning the two-signature requirement did so in connection with "redemption requests" generally, not necessarily limited to one mutual account fund out of a group account. Next, the defendant claims that certain language in section J of the same application form constitutes a general release of liability in connection with wire transfers. It does not, for many reasons. First, it is so ambiguous that it cannot fairly be read as a release of liability under Title 8 of the U.C.C., and, second, it would be against public policy for such a general, form release to be given effect over the standards of care and liability established in that statutory scheme. Finally, there is no signature, no initialing, or even a check mark in the applicable space showing that section J ever was agreed to, or became part of, the application. It stands, for the purposes of the parties' agreement and their contract (*see* U.C.C. Section 1–202(3) and (11)), outside the gate.

▮▮ Finally, as to relief, Section 8–507(b) gives the wronged entitlement holder the right to have the entitlement re-established, together with payments or distributions missed on account of the wrongful act of the intermediary, or, alternatively, damages. The plaintiff did not, in her amended complaint, demand re-establishment, but demanded damages. No formula is set forth in the statute for fixing damages, so the Court has looked to the law of Maryland. *See* U.C.C., Section 1–103. Such damages obviously include the principal amount of the account, and, because that loss is readily ascertained as a fixed amount, prejudgment interest. Such interest is properly recoverable, in the discretion of the Court, in this case under Maryland law. *See, e.g., Precon Corp. v. G & B Environmental, Inc.,* 103 F.3d 119, 1996 WL 694440 (4th Cir.1996)(*table*) (citing Maryland authority). The rate of prejudgment interest in Maryland is 6%. *Id.; see also, United Cable Television v. Burch,* 354 Md. 658, 732 A.2d 887 (1999). The award of prejudgment interest is designed to make up for lost investment opportunity in the case of a readily ascertainable monetary loss, and plaintiff's request for other damages (in the nature, *e.g.,* of lost gain of principal and lost income distributions) is far too speculative to be awarded as damages in any event, plaintiff having opted for damages rather than re-establishment of the account. Of course, postjudgment interest will be awarded at the statutory rate.

For the reasons stated, an Order will be entered separately, granting summary judgment in favor of plaintiff, and against American Express. This will not be a final, appealable order under Fed.R.Civ.P. 54, because the third-party complaint is still open, defendant not having moved for the entry of default or default judgment thereon. It may now so move, as the amount in question has been liquidated, and it is directed so to move within 20 calendar days hereof, so that a final judgment may be entered under Civil Rule 58, closing this case.

APPENDIX

8901 HERRMAN DRIVE, COLUMBIA, MD 21045 PH 410-381-0110 FAX 410-381-2566

## FAX TRANSMISSION

DATE: 10/16/97

TO: JEFF HELMS EXT 16936

COMPANY: AMERICAN EXPRESS FINACIAL SERIVCES

FAX NUMBER: 612-671-4364

FROM: MICHAEL D'AMBROSIA

SUBJECT: CLOSING ACCOUNTS AND HOLD TAKEN OFF ACCOUNTS

MESSAGE: PLEASE HAVE THE FUNDS FROM MY ACCOUNTS CLOSED AND WIRE TO ME AND AMY'S BANK ACCOUNT. THE JOINT ACCOUNT IS WITH FCNB BANK IN FREDERICK MARYLAND. THE ACCOUNT# IS 7092710106 AND THE ABA# IS 055000275. A COPY OF A CANCELLED CHECK IS ENCLOSED. PLEASE GIVE ME A CALL WHEN THE WIRE IS COMPLETE. THANKS AGAIN FOR THE HELP WITH THIS MATTER!!!!

THANKS MICHAEL AND AMY

TOTAL NUMBER OF PAGES INCLUDING COVER SHEET        3

# Client Group List Report

| Group ID | Client ID | Name | | | |
|---|---|---|---|---|---|
| 0589 5842 001 | 1637 7542 001 | D'Ambrosie, Michael | | | |
| | 1637 7543 001 | Powers, Amy | | | |

**Next Statement Date:** 11/05/1997
**Last Service Date:** 05/02/1997
**Next Service Date:** 00/01/1997
**Next Contact Date:** 11/04/1997

**Address**
8427 Hornets Nest Rd
Emmitsburg, MD 21727-9514

| Phone | Ext. | Type | Time of Day |
|---|---|---|---|
| (301) 447-2565 | | Home | Evening |
| (410) 381-0110 | | Work | Day |

| Product Name | Account Number | Retirement Plan | Value | Valuation Date |
|---|---|---|---|---|
| New Dimensions Fd | 0000 0010 6589 5842 002 | Account is not in a tax qualified plan | $22,162.53 | 08/15/1997 |
| Growth Fd | 0000 0011 9589 5842 002 | Account is not in a tax qualified plan | $17,643.67 | 08/15/1997 |
| Fed Income Fd | 0000 0012 4589 5842 002 | Account is not in a tax qualified plan | $0.00 | 08/15/1997 |
| Managed Allocation | 0000 0012 6589 5842 002 | Account is not in a tax qualified plan | $5,901.87 | 08/15/1997 |
| Blue Chip Advantage | 0000 0013 1589 5842 002 | Account is not in a tax qualified plan | $11,393.87 | 08/15/1997 |
| Equity Value | 0000 0013 7589 5842 002 | Account is not in a tax qualified plan | $16,938.98 | 08/15/1997 |
| Strategy Aggressive | 0000 0013 8589 5842 002 | Account is not in a tax qualified plan | $10,491.69 | 08/15/1997 |
| | | | $84,532.41 | |

CORR.
(1637754220)

September 16, 1997

American Express Financial Advisors
Attn: Jeff Helm
Atlantic Service Team
733 Marquette Avenue
Minneapolis, MN 55440

Please use this letter as your authorization to remove the hold from the accounts on the attached report. The intention was to transfer the mutual funds to Prudential Securities to consolidate, not to prohibit any/all activity.

Once the hold has been removed, please contact Tina at Prudential Securities 1-800-757-0802. Inform her of the proper ACAT instructions to transfer the accounts (OTC/Contrabroker info).

Your prompt attention to this request is most appreciated. I apologize for any confusion I may have caused AEFA and PSI.

Sincerely,

Michael D'Ambrosia

Amy Powers

My Commission expires 3/1/00

Otis K. Comstock

** TOTAL PAGE.01 **

## ORDER

For the reasons stated in the foregoing Memorandum Opinion, it is, this 24th day of January, 2000, by the Court, ORDERED and ADJUDGED:

1. That the defendant's motion for summary judgment BE, and it hereby IS, DENIED;

2. That the plaintiff's motion for summary judgment BE, and it hereby IS, GRANTED, as to the transfer pursuant to the October 16, 1997, communication, but otherwise DENIED;

3. That, upon disposition of the third-party claim (as to which the defendant is directed to request the entry of a default

and default judgment within 20 calendar days of the date hereof), a final judgment will be entered on the basis of this Order, awarding the plaintiff the sum of $86,-836.79, with prejudgment interest at 6% simple *per annum* from October 16, 1997 until the date thereof, and with interest from the date thereof until paid, and costs (but not attorney's fees); and

4. That the Clerk of Court mail copies hereof and of the foregoing Memorandum Opinion to counsel for the parties.