**Allene WATSON, Appellant–Defendant,**

v.

**Donna SEARS, Appellee–Plaintiff.**

No. 72A01–0108–CV–310.

Court of Appeals of Indiana.

April 29, 2002.

Robert L. Houston, Jennifer D. Lewis, Houston and Thompson, P.C., Scottsburg, IN, Attorneys for Appellant.

Rick E. Bartlett, Smith, Bartlett, Heeke, Carpenter & Thompson, Jeffersonville, IN, Attorneys for Appellee.

## OPINION

BROOK, Chief Judge.

### Case Summary

Appellant-defendant Allene Watson ("Allene") appeals the trial court's judgment in favor of appellee-plaintiff Donna Sears ("Sears"). We affirm.

### Issue

Allene raises one issue on appeal, which we restate as whether the trial court properly concluded that Sears is entitled to the assets once held in a securities account ("Account I").

### Facts and Procedural History

In November 1992, William Ira Watson ("Ira"), Sears' father, opened Account I, consisting entirely of bonds, at Edward D. Jones & Co., L.P. ("Edward Jones"). Ira registered Account I to Ira and Sears as joint tenants with rights of survivorship. On October 23, 1996, Ira executed with Edward Jones a "LETTER OF AUTHORIZATION TO MOVE FIRM NAME SECURITIES" ("the Letter") to transfer all assets from Account I to a new account ("Account II") registered to Ira, Sears, and Allene, Ira's wife, as joint tenants with rights of survivorship. The Letter contained a section entitled "SIGNATURE OF ALL REGISTERED OWNERS OF THE DELIVERING ACCOUNT[.]" Ira signed the Letter, and Sears' signature was forged. Sears was unaware that Accounts I and II existed before Ira died on September 11, 1999.

When Sears became aware of Accounts I and II, a dispute arose between Sears and Allene concerning the ownership of the assets in Account II. Sears and Allene did agree that Sears was entitled to no less than half the assets that Ira transferred from Account I to Account II. With all the assets from Account II, Sears and Allene created yet another account ("Account III") registered to Sears and Allene as joint tenants with rights of survivorship. Sears then withdrew half the assets from Account III. On December 14, 2000, Sears sued Allene to obtain the remaining assets in Account III. On August 16, 2001, after a bench trial, the trial court entered judgment for Sears and ordered Edward Jones

to transfer the assets remaining in Account III to Sears. Allene now appeals.

### Discussion and Decision

Allene contends that the trial court erred in concluding that Sears is entitled to the assets remaining in Account III. In reviewing an adverse judgment, "we will look to the evidence most favorable to the judgment and all reasonable inferences to be drawn therefrom. If there was substantial evidence of probative value, the judgment of the trial court will not be overturned." *In re Paternity of Tompkins,* 542 N.E.2d 1009, 1013 (Ind.Ct. App.1989). The trial court entered a general judgment, which "will be affirmed if it can be sustained upon any legal theory consistent with the evidence." *Shelby Eng'g Co. v. Action Steel Supply, Inc.,* 707 N.E.2d 1026, 1027 (Ind.Ct.App.1999).

We must address the following sub-issues in this appeal: (A) whether Sears has a legal right to the assets in Account III and (B) whether Sears can bring suit directly against Allene based on Ira's wrongful transfer of assets from Account I.

### A. *Sears' Legal Right to the Assets in Account III*

Allene contends that Ira's transfer of assets from Account I to Account II was valid and that she is therefore entitled to the assets remaining in Account III. Allene characterizes Ira's transfer of assets from Account I to Account II as merely changing the *form* of Account I, and she points out that Indiana Code Section 32–4–1.5–5 requires the written authorization of only *one* party to a joint account to change the form of the account.[1] Allene argues that the forgery of Sears' signature was irrelevant because Sears' signature was not required to transfer assets from Account I.

We need not address whether Ira's transfer of assets from Account I changed the form of Account I, however, because Indiana Code Sections 32–4–1.5–1 through 32–4–1.5–15 ("the Indiana Nonprobate Transfers Chapter" or "the Chapter") do not apply to the accounts at issue, which, as previously mentioned, consisted entirely of bonds. The Indiana Probate Code Study Commission comment to Indiana Code Section 32–4–1.5–1 makes it clear that although certain investment securities are governed by the Chapter, bonds are not:

> The definitions of "account"[2] and "financial institution"[3] in paragraphs (1) and (3) are broad enough to include a certificate of deposit issued by a savings and loan association as well as a certificate issued by a bank, although these documents may have different characteristics for commercial purposes.
>
> Specifically, it is to be noted that savings accounts, certificates of deposit,

---

1. Indiana Code Section 32–4–1.5–5 provides in relevant part that

   rights of survivorship are determined by the form of the account at the death of a party. This form may be altered by written order given by *a party* to the financial institution to change the form of the account or to stop or vary payment under the terms of the account. The order or request must be signed by *a party,* received by the financial institution during the party's lifetime, and not countermanded by other written order of the same party during his lifetime.
   (Emphases added.)

2. *See* Ind.Code § 32–4–1.5–1(1) (" 'Account' means a contract of deposit of funds between a depositor and a financial institution and includes a checking account, savings account, certificate of deposit, share account and other like arrangement.").

3. *See* I.C. § 32–4–1.5–1(3) (" 'Financial institution' means any organization authorized to do business in Indiana under IC 28, or federal law relating to financial institutions, including but not limited to, banks and trust companies, building and loan associations, industrial loan and investment companies, savings banks, and credit unions.").

share accounts, and the like are within the ambit of the act even though issued by a savings and loan association or a building and loan association. This is noteworthy because certificates and passbooks issued by such an association have, since the Uniform Commercial Code became effective on July 1, 1964, been regarded as registered investment securities. *Other investment securities, however, would not seem to be within the scope of the act.*

(Emphasis added and citations omitted.)

Article 8.1 ("Article 8.1") of Indiana's version of the Uniform Commercial Code ("the UCC") is entitled "Investment Securities" and comprises Indiana Code Sections 26–1–8.1–101 through 26–1–8.1–511. Part five of Article 8.1 (Indiana Code Sections 501 through 511) specifically governs securities accounts, which are "account[s] to which [] financial asset[s][are] or may be credited." Ind.Code § 26–1–8.1–501(a). Of relevance to the instant case, bonds are considered financial assets under Article 8.1. *See* Ind.Code § 26–1–8.1–102(a)(9)(ii) (defining financial assets, in part, as "obligation[s] of a person ... that [are] ... dealt in or traded on financial markets"); *see also* BLACK'S LAW DICTIONARY 172 (7th ed. 1999) (defining bond in relevant part as "[a] long-term, interest-bearing debt instrument issued by a corporation or governmental entity ..."). Simply put, Account I consisted entirely of bonds and was therefore a securities account governed by Article 8.1.

While there are no reported Indiana cases interpreting Article 8.1, we find one of the few foreign reported Article 8.1 cases to be very instructive. The facts in *Powers v. Am. Express Fin. Advisors, Inc.,* 82 F.Supp.2d 448 (D.Md.2000), *aff'd,* 238 F.3d 414, 2000 WL 1784167 (4th Cir. 2000), are similar to those in the instant case:

The relevant, undisputed facts establish that Powers [plaintiff] and D'Ambrosia [codefendant] started a romantic union in 1983 ... and, in mid-July, 1994, they entered into a mutual fund investment relationship with American Express [codefendant]. Their holdings were in joint-and-survivor form, pursuant to the Investment Application they filled out when making their first investment....

.... On October 16, 1997, D'Ambrosia sent American Express a communication requesting redemption of the investments and wire transfer of the proceeds to a joint bank account he had with Powers in Frederick. Attached to the faxed communication ... was a letter addressed to American Express, dated September 26, 1997, and bearing what purported to be the signatures of D'Ambrosia and Powers ... directing transfer of the proceeds to Prudential (another financial services agency)....

.... [T]he fly in the ointment ... is that D'Ambrosia had forged Powers' signature to that document. [Powers subsequently sued both American Express and D'Ambrosia for the wrongful transfer.]

*Id.* at 450–51.

As in the instant case, *Powers* involved a transfer of assets from a joint securities account pursuant to a transfer order on which one of the joint tenant's signatures had been forged. The *Powers* court analyzed the case under Maryland's version of Article 8.1 ("Title 8"), which in all relevant respects is identical to Indiana's Article 8.1:

There is agreement that this case involves "financial assets," as defined in MARYLAND COMMERCIAL LAW CODE ANN. ("U.C.C.") § 8–102(a)(9). As such, this transaction is governed by Title 8 of the Maryland U.C.C., as re-

cently revised, which sets up a comprehensive mechanism for dealing with rights and obligations of those who own (called "entitlement holders"[4]) and those who hold financial assets for them (called "intermediaries"[5]). Entitlement[6] holders are entitled to give orders[7] to their intermediaries on the transfer, disposition, etc., of financial assets. Unfortunately, there is no discernible case law anywhere under revised Article 8 of the U.C.C. (Title 8 in Maryland)—and very little commentary—dealing with the question of the effect of an entitlement order that is authorized by only one of the entitlement holders on a joint account. What commentary there is, as will be seen, has been taken into account by the Court.

It is clear that both D'Ambrosia and Powers were entitlement holders, as defined in Section 8–102(a)(7), in that they were identified in the records of the securities intermediary (defendant) as having a security entitlement against the intermediary. As such, D'Ambrosia was an "appropriate person"[8] to give an entitlement order to [American Express]. . . . .

The problem for [American Express] here is that, according to the terms of Section C of its Investment Application, under which the account was established, it is clear that *signatures of both* D'Ambrosia and Powers were required for any redemption request for over $50,000. Thus, for any redemption over $50,000 (and this one was for over $86,000), [American Express] itself required both holders' authorizations.

. . . . The Court is of the opinion, as a matter of law, that, . . . [American Express] is still liable to Powers, because the order, for which [Powers] never gave any form of authorization or ratified, was "ineffective."[9]

. . . . Section 8–107(b) establishes when an order is effective. . . . . [B]oth the reference in Section 8–107 to principles of agency[10] and Official Comment 4 to Section 8–507[11] lead to no other con-

---

**4.** *See* I.C. § 26–1–8.1–102(a)(7) ("'Entitlement holder' means a person identified in the records of a securities intermediary as the person having a security entitlement against the securities intermediary.").

**5.** *See* I.C. § 26–1–8.1–102(a)(14)(ii) ("'Securities intermediary' means: . . . (ii) a person, including a bank or broker, that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity.").

**6.** *See* I.C. § 26–1–8.1–102(a)(17) ("'Security entitlement' means the rights and property interest of an entitlement holder with respect to a financial asset specified in IC 26–1–8.1–501 through IC 26–1–8.1–511.").

**7.** *See* I.C. § 26–1–8.1–102(a)(8) ("'Entitlement order' means a notification communicated to a securities intermediary directing transfer or redemption of a financial asset to which the entitlement holder has a security entitlement.").

**8.** *See* Ind.Code § 26–1–8.1–107(a)(3) ("'Appropriate person' means: . . . . (3) with respect to an entitlement order, the entitlement holder[.]").

**9.** *See* I.C. § 26–1–8.1–107(b)(1) ("An endorsement, instruction, or entitlement order is effective if: (1) it is made by the appropriate person[.]").

**10.** *See* I.C. § 26–1–8.1–107(b)(2) ("An endorsement, instruction, or entitlement order is effective if: . . . (2) it is made by a person who has power under the law of agency to transfer the security or financial asset on behalf of the appropriate person[.]").

**11.** Official Comment 4 to Article 8.1, section 507 (Indiana Code Section 26–1–8.1–507) reads:

Subsection (b) provides that an intermediary is liable for a wrongful transfer if the entitlement order was "ineffective." Section 8–107 specifies whether an entitlement order

clusion than that, when the intermediary has agreed that the "appropriate person" to make an order is both owners of a joint account, both owners must make the order. .... No facts whatever are advanced that would show that D'Ambrosia had any sort of authority to affix Powers' forged signature to the document accompanying the order or that she ever ratified it.

*Id.* at 451–52 (citations omitted).

Simply put, if the appropriate person does not make the order to transfer assets, then the order is ineffective. *Cf.* I.C. § 26–1–8.1–107(b)(1) ("An endorsement, instruction, or entitlement order is effective if: (1) it is made by the appropriate person[.]"). Although Article 8.1 does not specifically address the rights and duties of appropriate persons in the context of joint securities accounts, we agree with the *Powers* court's conclusion that "when the intermediary has agreed [with the entitlement holders] that the 'appropriate person' to make an order is both owners of a joint account, both owners must make the order." *Powers,* 82 F.Supp.2d at 452. In the instant case, if the intermediary (Edward Jones) agreed with the entitlement holders (Ira and Sears) that both their signatures were required to order a transfer of assets from Account I, then the order was ineffective because only Ira signed it.

Although the Account I agreement was not entered into evidence at trial,[12] the Edward Jones employee who handled Accounts I and II testified that both signatures were required to order a transfer of assets from Account I to Account II. Moreover, the Letter specifically requested the names of all registered owners of the delivering account, from which we may infer that both signatures were in fact required. Allene does not deny that both signatures were required to order a transfer of assets from Account I, and there is no evidence to suggest that they were not. In short, the evidence indicates that both Ira's and Sears' signatures were required to order the transfer of assets from Account I. Because Sears did not sign the transfer order, the transfer was ineffective. Sears is thus entitled to the assets currently held in Account III.

Unlike the plaintiff in *Powers,* however, Sears sued the beneficiary of the wrongful transfer (Allene) but not the intermediary (Edward Jones). We must therefore de-

---

is effective. An "effective entitlement order" is different from an "entitlement order originated by an appropriate person." An entitlement order is effective under Section 8–107(b) if it is made by the appropriate person, or by a person who has power to act for the appropriate person under the law of agency, or if the appropriate person has ratified the entitlement order or is precluded from denying its effectiveness. Thus, although a securities intermediary does not have a duty to act on an entitlement order originated by the entitlement holder's agent, the intermediary is not liable for wrongful transfer if it does so.

Subsection (b), together with Section 8–107, has the effect of leaving to other law most of the questions of the sort dealt with by Article 4A for wire transfers of funds, such as allocation between the securities intermediary and the entitlement holder of the risk of fraudulent entitlement orders.

12. Indiana Trial Rule 9.2(A) provides that "[w]hen any pleading allowed by these rules is founded on a written instrument, the original, or a copy thereof, must be included in or filed with the pleading. Such instrument, whether copied in the pleadings or not, shall be taken as part of the record." However, failure to include with the pleadings a relevant written instrument, such as the Account I agreement, is not necessarily fatal. Trial Rule 9.2(F) provides, in part, that "[n]oncompliance with the provisions of this rule requiring a written instrument to be included with the pleading may be raised by the first responsive pleading or prior motion of a party." As neither party has argued the issue on appeal, we need not address it further.

termine whether Sears may recover the wrongfully transferred assets directly from Allene.

### B. Sears' Cause of Action Against Allene

■ Article 8.1 does not provide us with specific guidance in the instant case. We are not entirely rudderless, however, for Indiana Code Section 26–1–1–103 (Article 1, section 103 of the Indiana UCC) provides that

[u]nless displaced by the particular provisions of [the UCC], the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause, shall supplement the provisions of [the UCC].

■ One such principle of equity is the action for "money had and received," which we conclude is directly applicable to the instant case.

The rule governing causes of action for money had and received is clear that such an action for money had and received is an equitable remedy that lies in favor of one person against another, when that other person has received money either from the plaintiff himself or third persons, under such circumstances that in equity and good conscience he ought not to retain the same, and which money, *ex aequo et bono*,[13] belongs to the plaintiff. . . . .

In an action for money had and received, it is generally necessary for the plaintiff to prove only his right to the money and the defendant's possession, without showing that it has not been accounted for; and any facts, circumstances, or dealings from which it appears that the defendant has in his hands money of the plaintiff which he ought in justice and conscience to pay over to him, are competent evidence to support the action.

*Pufahl v. Nat'l Bank of Logansport,* 129 Ind.App. 191, 195, 154 N.E.2d 119, 120–21 (1958) (paragraph format altered from original) (internal quotation marks and citations omitted). To successfully prosecute an action for money had and received, Sears needed only to establish (1) her legal right to the assets in Account III (which she has done) and (2) Allene's possession of the assets (which is undisputed).

In summary, the accounts at issue are securities accounts and are therefore governed by Article 8.1 of the Indiana UCC. We further conclude that Sears has established her legal right to the assets in Account III and that she may recover them directly from Allene under a theory of money had and received.

Affirmed.

RILEY, J., and MATHIAS, J., concur.

---

**13.** "According to what is equitable and good." Black's Law Dictionary 581 (7th ed. 1999).