756 S.E.2d 136

In the Matter of the ESTATE OF Charles
Galen RIDER, a/k/a C.G. Rider.

Carolyn S. Rider, Petitioner,

v.

Estate of Charles Galen Rider, Thomas M. Grady,
Personal Representative, Respondent,

and

Deborah Rider McClure, Ginger C. Rider, Christian James
McClure and Austin Patrick McClure, Respondents.

Appellate Case No. 2011–197686.

No. 27367.

Supreme Court of South Carolina.

Heard Oct. 15, 2013.
Decided March 19, 2014.

William C. Cleveland, III and Laurel R.S. Blair, both of Womble Carlyle Sandridge & Rice, of Charleston; and Terry A. Finger, of Finger & Fraser, of Hilton Head Island, for Petitioner.

Douglas Whitsett MacNeille, of Ruth & MacNeille, of Hilton Head Island; and Daphne A. Burns, of Edmond, OK. Stephen Edward Carter, of Hilton Head Island, and Kelly McPherson Jolley, of McNair Law Firm, of Hilton Head Island, all for Respondents.

Justice BEATTY.

This Court granted a petition for a writ of certiorari to review the decision of the Court of Appeals in *Rider v. Estate of Rider*, 394 S.C. 84, 713 S.E.2d 643 (Ct.App.2011), which applied the common law of agency to hold that certain financial assets were part of the decedent's probate estate. The decedent had directed his bank to transfer specified assets in his investment account to a new account for his spouse, but died before all of the assets were credited to her account. At issue in this case of first impression is whether South Carolina's Uniform Commercial Code ("UCC") or the common law of agency controls the transfer. We reverse.

## I. FACTS

Charles Galen Rider ("Husband") executed an Investment Agency Agreement/Discretionary Account ("Account Agreement") with First Union National Bank of North Carolina ("First Union"), a predecessor of Wachovia Bank, N.A. ("Wachovia"), on September 27, 1993. The Account Agreement authorized First Union "to open and maintain an Agency Account" for Husband and "to hold therein, as [his] Agent, all cash, stocks, bonds, securities and other property . . . subject to" Husband's current and future written instructions. The Account Agreement stated First Union was "to provide investment review and management of the Account, taking such action as [the bank], in [its] discretion, deem[s] best . . . as though [the bank] were the owner of such property." This discretionary authority permitted First Union to buy, sell, and exercise certain rights regarding the securities in accordance with the overall investment objective selected by Husband. The terms of the Account Agreement called for its termination upon the bank acquiring actual knowledge of Husband's death, but that Husband's death "shall not affect the validity of any prior actions."

On June 8, 2005, Husband called Ruth DiLella in the Capital Management Group of what was then Wachovia [1] and informed her that he had met with his estate attorney, who had advised him to transfer some assets to his spouse, Carolyn

---

1. First Union merged into Wachovia, which was then subsequently acquired by Wells Fargo.

S. Rider ("Wife"). Husband was suffering from terminal cancer and reportedly wanted Wife to have sufficient funds to maintain her standard of living during the inevitable time that probate would be going on. Husband instructed DiLella to move $2 million in securities from his account at Wachovia and place them in a new account in Wife's name. DiLella told Husband that Wachovia would send him a list of specific securities to transfer, along with a signature page for him to sign to approve the transfer. The same day, DiLella e-mailed a list of assets totaling $2 million to Wachovia's trust department, along with Husband's instruction, so it could prepare a letter and asset listing for the client's approval.

On June 17, 2005, Husband signed the letter and returned it to the attention of Wachovia's trust administrator. The letter provided: "Please accept this letter as my authority and direction to transfer the assets listed on the following page to a new agency account to be opened for my wife, Carolyn Sue Rider." A total of $2 million in assets were listed, which included specific securities and a small sum of cash.

In response, Wachovia made a series of four transfers from June to October 2005. On June 21, 2005, four days after Husband's signing of the June 17th directive, Wachovia made the first transfer of $733,228.00 in securities (stocks) to Wife's account. On July 8, 2005, Wachovia transferred $39,672.00 in securities (stocks). That afternoon, Husband passed away in Charlotte, North Carolina, and Husband's daughter, respondent Deborah Rider McClure, notified Wachovia the same day. The next business day, Monday, July 11, 2005, Wachovia transferred $935,032.64 in securities (mutual funds) to Wife's account, and on October 20, 2005, Wachovia made a fourth and final transfer of $304,182.46 in securities (mutual funds). The total amount transferred to Wife's account was $2,012,115.00, the excess being due to the appreciation in the value of the securities.

In 2006, Thomas M. Grady, as personal representative of Husband's estate ("PR"), instituted this declaratory judgment action in the probate court for Beaufort County asking the court to determine either (1) that the securities transferred pursuant to Husband's June 17, 2005 letter to Wachovia were completed transfers on June 17, 2005 and, thus, were not

includible in Husband's probate estate; or (2) that the securities transferred after Husband's death on July 8, 2005 were incomplete transfers and were includible in Husband's probate estate. The PR did not take a position, but sought guidance as to whether the UCC or the law of agency under the South Carolina common law controlled the outcome.

In its order, the probate court stated much of the argument in this case centered on whether the UCC's provision on Investment Securities applies to the securities transfer directed by Husband on June 17, 2005. The probate court stated Wife argued the UCC applies, Husband's June 17, 2005 directive was an "entitlement order" under the applicable definition in the UCC found in S.C.Code Ann. § 36–8–102, the transfer was effectuated on June 17, 2005, and it was unaffected by Husband's death before completion of the transfers. In contrast, Husband's two daughters from his prior marriage, Deborah Rider McClure and Ginger C. McClure, and his two grandsons, Christian McClure and Austin McClure (collectively, "the McClure Respondents") argued, inter alia, that the UCC did not apply and, even if it did, it did not supplant the law of agency that governed the parties' Account Agreement. Either way, Wachovia's authority to make the transfers ended when it acquired actual knowledge of Husband's death and the disputed assets belonged to Husband's probate estate.

The probate court found the UCC controlled this securities transaction, that Husband's June 17, 2005 directive was an "entitlement order," and Wachovia was a "securities intermediary." However, it determined an entitlement order's "effective date" is a distinguishable concept from when an entitlement order is "effectuated." The probate court agreed with Wife that Husband's entitlement order was "effective" upon its issuance to Wachovia on June 17, 2005, but reasoned it still had to be carried out by Wachovia, the securities intermediary, to be "effectuated," and the UCC did not supplant the laws of property or agency, nor did it vitiate the terms of the Account Agreement.

The probate court noted Wachovia received actual notice of Husband's death on Friday, July 8th, that the second transfer of $39,672.00 was posted to Wife's account that day, and that the third transfer of $935,032.64 was posted to Wife's account

the next business day, Monday, July 11th. The court stated the credible testimony at trial persuaded it that Wachovia took the necessary actions to effectuate the second and third transfers before it knew of Husband's death. The court observed, "In the commercial context of the transactions, it would be unreasonable to conclude otherwise." [2]

The probate court concluded the first three transfers, totaling $1,707,932.64, which were posted to Wife's account on June 21, July 8, and July 11, 2005, respectively, were carried out and effectuated before Husband's death and are not part of his probate estate. However, the securities posted to Wife's account on October 20, 2005 in the amount of $304,082.46 belonged to Husband's probate estate because it was not effectuated until after Husband's death, when Wachovia's authority to act had already terminated.

Wife appealed to the circuit court, which affirmed in an order adopting the probate court's factual findings and legal conclusions. Wife appealed to the Court of Appeals, which found both the third and fourth transfers properly belonged to Husband's probate estate because they occurred after the bank had actual knowledge of Husband's death, but that no error was preserved regarding the third transfer because the McClure Respondents did not cross-appeal, so it too affirmed. *Rider v. Estate of Rider*, 394 S.C. 84, 713 S.E.2d 643 (Ct.App. 2011). The Court of Appeals also distinguished the "effective date" of Husband's entitlement order from the date it was "effectuated" and found the latter determinative of the question of ownership. This Court granted Wife's petition for a writ of certiorari to review the decision of the Court of Appeals.

## II. STANDARD OF REVIEW

■ "An appellate court's determination of the standard of review for matters originating in the probate court is controlled by whether the cause of action is at law or in equity."

---

2. The probate court stated the testimony from Wachovia's employees indicated the different transfer dates were due to the nature of the assets being transferred, as stocks were processed more quickly than other types of securities, although some of the transfers did take longer than the "norm."

*Holcombe–Burdette v. Bank of Am.*, 371 S.C. 648, 654, 640 S.E.2d 480, 483 (Ct.App.2006). This case began as an action for a declaratory judgment in the probate court, which can be legal or equitable. *See Estate of Gill ex rel. Grant v. Clemson Univ. Found.*, 397 S.C. 419, 425, 725 S.E.2d 516, 519–20 (Ct.App.2012) ("Whether an action for declaratory relief is legal or equitable in nature depends on the plaintiff's main purpose in bringing the action." (citation omitted)).

All parties in this matter agree that an action to determine whether or not certain funds belong to the probate estate, which involves consideration of the applicability of the UCC statutes and the laws of agency to Husband's contract with the bank and his written directive, presents a matter of law, as opposed to equity, for the court. *See generally Auto Owners Ins. Co. v. Rollison*, 378 S.C. 600, 663 S.E.2d 484 (2008) (finding where the declaratory judgment action involved the interpretation of a contract and statutes, it was an action at law).

"When a probate court proceeding is an action at law, the circuit court and the appellate court may not disturb the probate court's findings of fact unless a review of the record discloses there is no evidence to support them." *Neely v. Thomasson*, 365 S.C. 345, 349–50, 618 S.E.2d 884, 886 (2005). "Questions of law, however, may be decided with no particular deference to the lower court." *Id.* at 350, 618 S.E.2d at 886.

### III. LAW/ANALYSIS

Wife contends the UCC addresses the subject matter at issue in this appeal, arguing only where the UCC is incomplete does the common law provide the applicable rule. *See* S.C.Code Ann. § 36–1–103 (2003) ("Unless displaced by the particular provisions of this act [Title 36, the UCC], the principles of law and equity, including . . . the law relative to capacity to contract, principal and agent, estoppel, fraud, . . . or other validating or invalidating cause shall supplement its provisions."); *Hitachi Elec. Devices (USA), Inc. v. Platinum Techns., Inc.*, 366 S.C. 163, 170, 621 S.E.2d 38, 41 (2005) ("Only where the U.C.C. is incomplete does the common law provide applicable rules.").

Chapter 8 of our state's UCC governs "Investment Securities." S.C.Code Ann. § 36–8–101 (2003). It is based on the state's adoption of the revised Article 8 contained in the model Uniform Commercial Code prepared by the American Law Institute in collaboration with the National Conference of Commissioners on Uniform State Laws. Its primary purposes are to provide uniformity in the securities industry and to provide an accurate description of the realities of the securities markets, and secondarily to enhance the value-adding factors of liquidity and certainty in securities transactions. S.C.Code Ann. §§ 36–8–101 to –511 cmt. at 82 (2003 & Supp. 2013) (S.C. Reporter's Introductory Comment to the 2000 Revision). Part 5 of Chapter 8, entitled "Security Entitlements," specifically governs the "indirect holding system," whereby purchasers of securities deal with intermediaries who hold securities for others, as compared to the traditional system whereby purchasers deal directly with the issuers of those securities. *See* cmt. at 83. It is noted in the Introductory Comment that these provisions "supplant a pastiche of common law rules and agreed practices." *Id.*

In the current matter, Wachovia held certain financial assets (securities) for Husband and managed those assets, subject to his oversight, pursuant to the Account Agreement, by which the bank acted as Husband's agent. This relationship thus implicates the indirect holding system set forth in Part 5 as well as general UCC provisions. Under the terms of the UCC, Husband was an "entitlement holder" with a "security entitlement" to the "financial assets" in a "securities account" maintained and managed by Wachovia for Husband's benefit in its capacity as a "securities intermediary." These and related terms are statutorily defined.

A "financial asset" includes "a security" or a share or other interest in property "which is, or is of a type, dealt in or traded on financial markets[.]" S.C.Code Ann. § 36–8–102(a)(9) (2003). A "securities account" is "an account to which a financial asset is or may be credited in accordance with an agreement under which the person maintaining the account undertakes to treat the person for whom the account is maintained as entitled to exercise the rights that comprise the financial asset." *Id.* § 36–8–501(a).

Wachovia is a "securities intermediary," which is defined to include "a bank . . . that in the ordinary course of its business maintains securities accounts for others and is acting in that capacity." *Id.* § 36–8–102(a)(14)(ii).

Husband was the "entitlement holder," which the UCC defines as follows: "A person identified in the records of a security intermediary as the person having a security entitlement against the securities intermediary. If a person acquires a security entitlement by virtue of Section 36–8–501(b)(2) or (3), that person is the entitlement holder." *Id.* § 36–8–102(a)(7).

A "security entitlement" consists of "the rights and property interest of an entitlement holder with respect to a financial asset specified in Part 5 [of Title 36]." *Id.* § 36–8–102(a)(17). Section 36–8–501(b) of the UCC provides a person generally acquires a security entitlement if a securities intermediary does any of the following three things: "(1) indicates by book entry that a financial asset has been credited to the person's securities account; (2) receives a financial asset from the person or acquires a financial asset for the person and, in either case, accepts it for credit to the person's securities account; or (3) becomes obligated under other law, regulation, or rule to credit a financial asset to the person's securities account." *Id.* § 36–8–501(b).

Husband, as the entitlement holder, retained the right to direct Wachovia to make changes in his account by issuing an "entitlement order," i.e., "a notification communicated to a securities intermediary directing transfer or redemption of a financial asset to which the entitlement holder has a security entitlement." *Id.* § 36–8–102(a)(8).

Wachovia was statutorily required to respond to an appropriate entitlement order. *See id.* § 36–8–506 ("A securities intermediary shall exercise rights with respect to a financial asset if directed to do so by an entitlement holder."); *id.* § 36–8–507(a) ("A securities intermediary *shall comply* with an entitlement order if [1] the entitlement order is *originated by the appropriate person*, [2] the securities intermediary has had reasonable opportunity to assure itself that the entitlement order is genuine and authorized, and [3] the securities inter-

mediary has had *reasonable opportunity to comply* with the entitlement order." (emphasis added)).

An "appropriate person" with respect to an entitlement order is the entitlement holder. *Id.* § 36–8–107(a)(3). However, if the person "is deceased, the designated person's successor taking under other law or the designated person's personal representative acting for the estate of the decedent" is an appropriate person to initiate an entitlement order. *Id.* § 36–8–107(a)(4).

The UCC further provides that "[e]ffectiveness of an ... entitlement order is determined as of the date the ... entitlement order *is made,* and an ... entitlement order *does not become ineffective by reason of any later change in circumstances." Id.* § 36–8–107(e) (emphasis added). Subsection (e) clarifies the protection from liability of securities intermediaries who rely on appropriate persons, and "[t]his protection reflects the policy of revised Article 8 to enhance liquidity and finality in securities transactions." *Id.* § 36–8–107 cmt. at 143 (S.C. Reporter's Comment to 2000 Revision).

In the Court of Appeals, the court first reviewed the terms of the Account Agreement and found the "prior actions" clause therein refers to both Husband's and Wachovia's conduct and that the plain language of the agreement showed Wachovia's authority ended upon actual knowledge of Husband's death. *Rider v. Estate of Rider,* 394 S.C. 84, 91, 713 S.E.2d 643, 646–47 (Ct.App.2011). The court stated the determination whether the securities in the fourth transfer were part of Husband's estate was, therefore, determined by whether Husband's and Wachovia's conduct was sufficient to complete the transfers before Wachovia learned of Husband's death. *Id.* at 91, 713 S.E.2d at 647.

Wife argued the general agency rule that an agent lacks authority to act for a principal after a principal's death, relied upon by the McClure Respondents, does not apply to this situation because Husband's June 17, 2005 directive was an effective entitlement order under Article 8 of the UCC. *Id.* Wife contended (1) an effective entitlement order transfers the right to financial assets the date it is made and, (2) even if it does not, an entitlement order *remains effective* pursuant to the UCC provision above, which displaces the agency rule

under the common law, so that actions taken to comply with the entitlement order may be completed regardless of later changes in circumstances. *Id.* at 91–92, 713 S.E.2d at 647.

The Court of Appeals rejected both of Wife's contentions and determined "the probate court properly found the [securities in] the fourth transfer are part of [Husband's] estate." *Id.* at 93, 713 S.E.2d at 648. In reaching this conclusion, the Court of Appeals stated the UCC applied, but nevertheless found the UCC's rule as to the effective date of an entitlement order contained in section 36–8–107(e) of the UCC did not fully address the subject, so it did not displace the relevant agency rule. *Id.* at 93–95, 713 S.E.2d at 648–49.

Applying the common law of agency, the Court of Appeals reasoned that an entitlement order does not complete a transfer of financial assets at the time it is made, so like other orders to agents, it is an instruction to act in the manner the principal desires, and the request is terminated by the principal's death, citing *Carver v. Morrow,* 213 S.C. 199, 204, 48 S.E.2d 814, 817 (1948) (stating as a general rule, an "agency terminates upon the death of the principal") and C.J.S. *Agency* § 122 (2003) ("The fact that the agent has performed, as authorized, one or several acts of that which was contemplated as a single transaction does not operate to preserve or keep alive the power until the completion of the transaction."). *Id.* at 93–94, 713 S.E.2d at 648.

█ The court distinguished the effective date of the entitlement order from the date it was completed by Wachovia, which it defined as when the assets were credited to Wife's account, and it found the fourth transfer at issue was completed by Wachovia in October 2005, citing S.C.Code Ann. § 36–8–501(b)(1) (providing a book entry by the securities intermediary to a person's account establishes a security entitlement).[3] *Id.* at 94, 713 S.E.2d at 648. As a result, the court held the securities in the fourth transfer, having been credited after

---

3. The Court of Appeals held no issue was preserved as to the third transfer as the McClure Respondents did not cross-appeal. *Rider,* 394 S.C. at 93, 713 S.E.2d at 647. We agree. It further held Wife did not preserve the issue of whether the transfers were completed or incomplete gifts. *Id.* at 96–97, 713 S.E.2d at 649–50. We need not reach the latter question as we decide the case on other grounds.

the bank's knowledge of Husband's death, are properly part of Husband's probate estate because the bank's authority under the Account Agreement had ended. *Id.* at 96, 713 S.E.2d at 649.

Several jurisdictions have observed there is a dearth of authority addressing the unique problems arising under Article 8 of the UCC. *See, e.g., Meadow Homes Dev. Corp. v. Bowens,* 211 P.3d 743, 745 (Colo.App.2009) (stating the "appeal raises issues of first impression under Revised UCC Article 8 (Investment Securities)" that had not previously been considered in the jurisdiction and that "have received surprisingly little attention elsewhere"); *Watson v. Sears,* 766 N.E.2d 784, 788 (Ind.Ct.App.2002) ("Unfortunately, there is no discernible case law anywhere under revised Article 8 of the U.C.C. (Title 8 in Maryland)—and very little commentary—dealing with the question of the effect of an entitlement order that is authorized by only one of the entitlement holders on a joint account.").

As one legal commentator has opined, a significant body of case law has not developed for the indirect holding system, and the reported cases generally have applied whatever principles were necessary to protect an innocent investor, so they did not create well-reasoned legal doctrines to resolve the competing policies unique to the indirect holding system. Russell A. Hakes, *UCC Article 8: Will the Indirect Holding of Securities Survive the Light of Day?,* 35 Loy. L.A. L.Rev. 661, 678 (2002). "The drafters [of UCC Article 8] had the benefit of effectively starting with a clean slate." *Id.* "Troubling precedents could be overruled by the adoption of contrary concepts that matched the perceptions of those most familiar with the operation of the system-securities professionals." *Id.* "The interest and experience of securities professionals were essential to an Article 8 that could successfully govern the indirect holding system." *Id.*

"The securities industry did not want to use principles of bailment, agency, or trust law to describe the basic operations of the indirect holding system, even though agency law governs much in the relationship between the securities industry and its customers." *Id.* at 678–79. "One important goal in revising Article 8 was to simplify transfer rules for the indi-

rect holding system." *Id.* at 679. Moreover, "[t]he drafters also caution courts not to use 'mechanical jurisprudence' but to interpret the definitions based upon the suitability of applying Article 8's substantive rules." *Id.* at 681 (citation omitted).

We agree with the Court of Appeals that the UCC does not invalidate all general principles of agency, but, as noted by the commentator above, those principles must be viewed in light of the unique nature of the indirect holding system. The UCC provisions were created to provide a uniform method of resolving issues in order to promote liquidity and finality, to be supplemented by (not thwarted by) the rules of agency and other applicable laws. *See* S.C.Code Ann. §§ 36–8–101 to –511 cmt. at 82 (2003 & Supp. 2013) (S.C. Reporter's Introductory Comment to the 2000 Revision) (observing the provisions in Part 5 of the UCC governing Investment Securities "supplant a pastiche of common law rules and agreed practices"); *see also Psak, Graziano, Piasecki & Whitelaw v. Fleet Nat'l Bank*, 390 N.J.Super. 199, 915 A.2d 42, 45 (Ct.App.Div.2007) ("Indeed, the UCC displaces the common-law where reliance on the common law would thwart the purposes of the UCC." (citing *Sebastian v. D & S Express, Inc.*, 61 F.Supp.2d 386, 391 (D.N.J.1999))).

In relying upon agency law to mandate that both Husband's execution of the entitlement order and full compliance by the securities intermediary exist prior to Husband's death, the Court of Appeals has created an additional requirement that does not exist under the UCC and that thwarts the purpose of the language in section 36–8–107(e) establishing a uniform effective date for entitlement orders, regardless of subsequent events. Moreover, it also overlooks the fact that under UCC section 36–8–501(b), the making of a "book entry" is but one of several means by which Wife can acquire an interest in the securities.

Once Husband issued the entitlement order and was the appropriate person, Wachovia was obligated by the UCC and the parties' Account Agreement to obey his directive. Wachovia had set up a new investment account in Wife's name and commenced the transfer of securities within a few days of Husband's request, so at that point, Wife already had a recognizable interest, even though Wachovia had not posted

all of the securities to her account. The Court of Appeals, in focusing solely on the date of the "book entry," which it took to mean the date the securities were credited or posted to Wife's account, seemed to view this as the exclusive means for obtaining an interest in the securities. However, a security entitlement is created if a securities intermediary does *any* of the following three things:

(1) indicates by book entry that a financial asset has been credited to the person's securities account;

(2) receives a financial asset from the person or acquires a financial asset for the person and, in either case, accepts it for credit to the person's securities account; or

(3) becomes obligated under other law, regulation, or rule to credit a financial asset to the person's securities account.

S.C.Code Ann. § 36–8–501(b).

In this case, while the Court of Appeals relied on book entry under subsection (b)(1), we agree with Wife that under subsection (b)(3), Wachovia had a legal obligation to credit the securities to Wife's account.[4] As noted in the Official Comment to § 8–501 of the Uniform Act:

Paragraph (3) of subsection (b) sets out a residual test, *to avoid any implication that the failure of an intermediary to make the appropriate entries* to credit a position to a customer's securities account *would prevent the customer from acquiring the rights* of an entitlement holder under Part 5. As is the case with the paragraph (2) test, the paragraph (3) test *would not be needed for the ordinary cases,* since they are covered by paragraph (1).

Unif. Commercial Code, Official Comment to § 8–501, 2C U.L.A. 579, 581 (2005) (emphasis added).

Wachovia's failure to more quickly make the last posting to Wife's account clearly is not the ordinary case, and it falls squarely within the parameters of the residual provision in section 36–8–501(b)(3). Although the Court of Appeals treats

---

4. At oral argument, the parties agreed the UCC does not define the term "book entry," so the drafters intended it to have a broad meaning. In addition, although not necessary to our disposition, we believe the transfer in this case also falls within the ambits of subsection (b)(2), as Wachovia received and accepted financial assets for credit to Wife's securities account.

the transfers as separate, unrelated events subject to termination under general agency law, we conclude Husband's execution of an entitlement order directing Wachovia to transfer certain specified securities to Wife is a singular act that falls squarely within the "prior act" language of the parties' agreement. Further, Wachovia's obligation to comply with Husband's entitlement order is supported by the UCC provisions examined above and comports with Article 8's goals of liquidity and finality in securities transactions. Consequently, we hold the disputed assets in this case properly belong to Wife and are not includible in Husband's probate estate.

## IV. CONCLUSION

For the foregoing reasons, the decision of the Court of Appeals is reversed.

**REVERSED.**

TOAL, C.J., KITTREDGE, HEARN, JJ., and Acting Justice JAMES E. MOORE, concur.